CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

May 11, 2026

LAURA A. AUSTIN, CLERK
BY:  s/ CARMEN AMOS
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**
LYNCHBURG DIVISION

|  |  |
|---|---|
| KHALIL JAMAL BRAXTON, <br><br> *Plaintiff,* <br><br> v. <br><br> DETECTIVE G.L. WATERMAN,[1] <br><br> *Defendant.* | CASE NO. 6:25-CV-00019 <br><br> **MEMORANDUM OPINION** <br><br> JUDGE NORMAN K. MOON |

Plaintiff Khalil Braxton ("Braxton") claims that Lynchburg Police Detective G.L. Waterman ("Waterman") violated his constitutional rights in violation of 42 U.S.C. § 1983 and assaulted him in violation of Virginia law. Dkt. 1-1. Braxton alleges that on September 29, 2020, Waterman "conducted an invasive strip search" of him that violated his rights under the Fourth and Fourteenth Amendments. *Id.* ¶¶ 11, 16-22.[2] He also claims Waterman assaulted him and acted with willful and wanton negligence during the search. *Id.* ¶¶ 23-31. He seeks monetary damages on all claims. *Id.*

---

[1]     Though this complaint was initially filed against Lynchburg Police Department ("LPD") as well, the Court previously dismissed the LPD as a party to this case. Dkt. 14.

[2]     Virginia applies the two-year statute of limitation for personal injury to § 1983 claims as § 1983 lacks its own statute of limitations. Va. Code § 8.01-229; *Wilson v. Garcia*, 471 U.S. 261, 280 (1985). In his answer, Waterman merely states that he "reserves the right to rely upon and assert all other affirmative defenses, including, but not limited to statute of limitations" and never raised the argument in a motion to dismiss or his motion for summary judgment. *See* Dkt. 9 ¶ 24. Waterman cannot unilaterally change the requirement that affirmative defenses must be specifically pled or are waived. Fed. R. Civ. Pro. 8(c)(1). Therefore, the Court finds Waterman has waived a statute of limitations defense.

Waterman, through counsel, argues he is entitled to summary judgment because (1) no reasonable juror could find that Waterman violated the Fourth Amendment; (2) the Fourteenth Amendment is an improper vehicle for an excessive force claim; and (3) he is otherwise entitled to qualified immunity. Dkts. 21, 22. Braxton opposes the motion. Dkt. 26. For the following reasons, Waterman's motion for summary judgment will be granted in part and denied in part.

**FACTS**

On September 29, 2020, around 10:25 in the morning, Waterman pulled over a red Dodge Magnum. Dkt. 22, Ex. A (Video from Waterman's body worn camera) 0:34-0:45. He approached the driver's side door, said "hey man, how's it going? The reason I pulled you over is for window tint, these things are way too dark, especially on the back." *Id.* 0:45-0:51. The passenger, Ms. Octavia Scott, responded by saying "Can I say something? I ride past them every day, I got pulled over multiple times, and they never got me for window tint." *Id.* 0:51-1:00. The two continued to converse until Waterman offered to test the windows to let Scott know how dark they were. *Id.* 1:00-1:20.

Waterman then asked the driver for his driver's license, he responded, "I don't have it on me, but I got one;" Waterman then asked for his name, and he responded "Ayeque Page" and spelled his name. Dkt. 22, Ex. A 1:21-1:27. Waterman then asked Page to roll down his back window and said, "I didn't even know someone was back there, that's how dark your windows are. I just saw him moving around." *Id.* 2:38-2:46. Page and Scott both said the back driver's window did not work, so Waterman cracked the door and asked for the second passenger's name.

2

*Id.* 2:46-2:51. He identified himself a "Khalil Braxton" and spelled his name for Waterman. *Id.* 2:51. Waterman walked back to his vehicle.[3]

Speaking to another officer, Waterman said "this is a good one" and "I haven't asked for consent or anything yet . . . I think he was on the run for some time, as a matter of fact, I wanna say he was a suspect maybe in a shooting or a robbery." Dkt. 22, Ex. A 3:55-4:11. Waterman ran the information through his device and said, "the driver's showing as a criminal gang member." *Id.* 4:25-4:30. He also remarked "I'm going to check their front and rear windows, I'll probably just write her for one" and "I'll see if I they'll give consent while I'm up there." *Id.* 4:48-4:58. Waterman then retrieved his window tint monitor and walked back toward the Dodge. *Id.* 5:00-5:23.

Waterman confirmed the Dodge belonged to Scott and then began preparing the window tint monitor. Dkt. 22 Ex. A 5:23-5:28. He asked, "is there anything illegal inside the vehicle," and Scott responded, "no sir." *Id.* 5:49-5:51. Waterman then asked "y'all consent to a search of the vehicle," and Scott responded, "no." *Id.* 5:51-5:55. Waterman asked "y'all smoke weed or anything like that," and Scott responded, "no." *Id.* 5:56-6:00. Waterman asked "is there any marijuana in the vehicle," and Scott responded, "no." 6:00-6:03.

Waterman completed his test of the front window's tint and told Scott "the front window's testing at 30%" even though it was "supposed to be at 50 or better." Dkt. 22, Ex. A 6:03-6:20. He then tested the back window which came back at "20." *Id.* 6:27-6:32. Waterman then told Scott, "I'm going to cut you a break on one and write you for the other. Is that fair?" Scott responded,

---

[3]    During this initial interaction, two other officers arrived on the scene. They do not come into view until Waterman turns around, revealing another officer and two vehicles in addition to his own. Dkt. 22, Ex. A 3:28-3:34.

"that's fine." *Id.* 6:32-6:38. While Waterman was in his vehicle writing the ticket,[4] Lynchburg Police Officer Seth Reed ("Reed") approached the Dodge, told the parties he would be performing an exterior scan of the vehicle with his K9, and told Scott, Braxton, and Page to step out of the vehicle. Dkt. 22, Ex. D ("Reed BWC") 4:09-4:25. On his way to get the K9, Reed frisked Braxton and instructed him "you're good, just keep your hands out of your pockets, okay?." *Id.* 4:49-4:55.

Reed retrieved the K9, walked the K9 around the Dodge, and said "the K9 alerted to the odor of narcotics coming from the vehicle, this officer's going to place you guys in handcuffs, just gonna be detained, okay?" Reed BWC 5:35-6:05. Waterman placed Page in handcuffs. Dkt. 22, Ex. A 9:04-9:17.[5] Scott spoke to several people off-camera and then said "ain't nothing in there. Y'all can search it, ain't gonna find nothing." *Id.* 6:24-6:29. Reed returned the K9 to his vehicle. *Id.* 6:53-6:55. Waterman began searching the Dodge, starting with the driver's side door. *Id.* 10:25-10:58. Another officer began assisting in the search. *Id.* 11:47.

While searching the rear seat on the driver's side, Waterman found a plastic bag with a tightly wrapped bag of white powder, which he identified as "an eight ball of coke." Dkt. 22, Ex. A 15:56-16:05. He also found "a digital scale" and "a whole bunch of powder" in the front pocket of the backpack. *Id.* 16:14-16:39. Waterman retrieved evidence bags from his vehicle, bagged the items, and placed them on the roof of the Dodge. *Id.* 17:01-17:47.[6]

---

[4]     Waterman wrote the ticket from approximately 6:45-8:51 on his BWC.

[5]     After handcuffing Page, Waterman spoke to Scott and said he called in the K9 because of "y'alls history . . . a history of some stuff." Dkt. 22, Ex. A 9:21-9:25.

[6]     Around the same time, the officer assisting Waterman found a plastic spice container with what appeared to be "homemade pills" in the rear passenger door. Dkt. 22, Ex. A 17:45-18:00. These were also placed on the Dodge's roof.

In addition to the backpack on the backseat, Waterman found a container of MiraLAX, which Page said was his as he had "bowel movement problems." Dkt. 22, Ex. A 18:21-18:48, Reed BWC 15:55-16:03. Waterman looked in the container and said "yep. Look inside of there. They concealed a bunch of cocaine in there." *Id.* 18:40-18:45. Waterman dumped out the MiraLAX powder onto the ground outside the Dodge and retrieved a small plastic bag from the container, which he also placed on the Dodge's roof. *Id.* 18:50-19:41.

Waterman then said, "you wanna start on the trunk and I'll go search the guys." Dkt. 22, Ex. A 22:55-22:57. He asked "if you could just step over here Khalil" and motioned for Braxton to come closer to the Dodge in order to be searched. *Id.* 23:07-23:14. Braxton complied. *Id.* Waterman began searching Braxton's pockets, emptying both his right and left pockets completely without first patting him down. *Id.* 23:14-25:24. He next searched Braxton's waistband as they discussed his family and military involvement. *Id.* He then told Braxton "stand where you're at, take a slight squat." *Id.* 25:25-25:27.

Waterman began feeling the area between Braxton's legs and said "I'm gonna check alright?" and Braxton immediately began moving to his right, away from Waterman, saying "I promise there's nothing right there" and "you don't need to grab my fuckin' balls bro." Dkt. 22, Ex. A 25:27-35.[7] Waterman pulled Braxton by his left arm back toward the Dodge and said "stop . . . I can feel something," Braxton responded by saying, "can I tell you what it is? It's my scrotum. That is my scrotum." *Id.* 25:38-25:52. Waterman said, "I'm gonna search," and the officer assisting with the search said "that is where people hide coke. We're not saying you have any, but we can't confirm or deny that until we're finished, okay?" *Id.* 25:52-26:07.

---

[7]    Scott echoed this sentiment as she watched the search by saying "well they is really grabbin' his balls and his ass. They all in his ass and in all of his balls." Reed BWC 22:48-22:59.

Waterman said "just chill bro," asked if Braxton had "shorts or underwear" on under his sweatpants, began searching Braxton's waistband a second time. Dkt. 22, Ex. A 26:07-26:25. Braxton again began moving away from Waterman, and Waterman said "stop, stop moving" and continued to search the area between Braxton's legs. *Id.* 26:21-26:40. As Braxton continued to protest, Waterman said "I need to search you good based on what I found in the car already. It is what it is. You can thank your people over there." *Id.* 26:40-26:48. Waterman then said "Imma search you a little better because you keep stretching your legs and I can't feel anything because of your sweatpants. Come back here away from them, because I'm not dealing with the circus." *Id.* 26:48-27:00. Waterman then led Braxton between two police vehicles and searched Braxton's waistband and between his legs a third time. *Id.* 27:00-28:14.[8] After searching Page, Waterman called Braxton back over to search his shoes and socks. *Id.* 32:17-32:55. After several more minutes, Waterman field tested the substances discovered in the car, determined them to not

---

[8]     Before the third search began, Waterman and Braxton had the following conversation:

> W: I just can't feel. I'm not saying you do [have anything on you], I just can't feel because you keep stretching your sweatpants. Every time I get down there you move around.
> B: I step because you're… you're grabbing my johnson. You're grabbing my private area.
> W: Here's the deal. I found something in the car. You getting searched.
> B: Okay, that's fine. I understand.
> W: It is what it is.
> B: I understand it.
> W: I know it's uncomfortable. It's uncomfortable for me too. I don't enjoy doing it. Alright? But I'm going to search you.
> B: But there's a difference between searching and feeling for something. Like that you're not…
> W: Stop. Stop. Stop moving around alright? Then I can search you and I can be done with it. Alright? I don't think it's comfortable either.
> B: Go ahead.

Dkt. 22, Ex. A 27:13-27:48.

contain illegal substances, took contact information from the parties, and left the scene without making an arrest.

## LEGAL STANDARD

When considering a motion for summary judgment, a court must grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. To avoid this, the nonmoving party must demonstrate a genuine dispute of material fact, put differently, the nonmoving party must show the existence of facts that "might affect the outcome of the suit under the governing law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When considering a motion for summary judgment, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). In arguing for dismissal of a Rule 56 motion, the nonmoving party must present evidence that meets "the substantive evidentiary standard of proof that would apply at a trial on the merits." *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## ANALYSIS

### A. Fourth Amendment Claim

#### a. A reasonable jury could find Waterman's search was "unreasonable"

The Fourth Amendment to the United States Constitution protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Typically, this means searches may

7

only occur when supported by both a warrant and probable cause. *Riley v. California*, 573 U.S. 373, 382 (2014); *United States v. Aigbekaen*, 943 F.3d 713, 719 (4th Cir. 2019). Yet, "[i]n the absence of a warrant," a search may still be reasonable "if it falls within a specific exception to the warrant requirement." *Riley*, 573 U.S. at 382; *see also Katz v. United States*, 389 U.S. 347, 357 (1967). As Waterman did not have a warrant to search Braxton, the Court now analyzes if Waterman's search falls within an exception to the warrant requirement.

1.  *Search Incident to Lawful Arrest*

A search incident to a lawful arrest is an exception to the warrant requirement. *Chimel v. California*, 395 U.S. 732, 755 (1969). These searches "must be substantially contemporaneous" with an arrest. *United States v. Currence*, 446 F.3d 554, 557 (4th Cir. 2006) (quoting *Stoner v. California*, 376 U.S. 483, 486 (1964)) (internal quotations omitted). The search may occur before an arrest, however, the search "may not . . . serve as a part of [the arrest's] justification." *Sibron v. New York*, 392 U.S. 40, 63 (1968).

Waterman argues the search is "analogous to a search incident to arrest" and that this exception does not actually require a formal arrest to have occurred to apply. Dkt. 27 at 2. Waterman relies heavily on *Cupp v. Murphy* to support this argument. 412 U.S. 291 (1973). The Supreme Court in *Cupp* found a brief search under the defendant's fingernails during a police interview shortly after the defendant's wife was found strangled in their apartment to be a lawful search incident to arrest (even though the defendant was not actually arrested until a month later). *Id.* at 296. Yet, the Court couched its reasoning in the limited nature of the search in question, as well as the defendant's later arrest, explicitly stating "we do not hold that a full Chimel search would have been justified in this case." *Id.*

*Cupp* is factually distinguishable from this case. First, Braxton was never formally arrested as the substances at the scene did not contain narcotics.[9] And second, Waterman's search was far more invasive, and more akin to a full *Chimel* search, than the limited search under the defendant's fingernails in *Cupp*. As such, a reasonable jury could not conclude this search is a search incident to arrest; therefore, it does not fall within this exception to the warrant requirement.

### 2. *Consent*

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). A suspect's consent "may be inferred from actions as well as words." *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003). Courts must determine the voluntariness of a suspect's consent "in light of the totality of the circumstances." *United States v. Gordon*, 895 F.2d 932, 938 (4th Cir. 1990); *United States v. Azua-Rinconada*, 914 F.3d 319, 324 (4th Cir. 2019).

After Waterman searched Braxton twice by the Dodge, he moved him between two police vehicles and searched him for a third time. Dkt. 22, Ex. A 27:00-28:14. Before this third search began, Waterman told Braxton, "I found something in the car. You getting searched," to which Braxton responded, "That's fine, I understand but there's a difference between searching and feeling for something." *Id.* Waterman interrupted him, saying "stop moving around alright? Then I can search you and I can be done with it. Alright?" *Id.* Braxton responded, "go ahead." *Id.*

Waterman argues this conversation demonstrates that Braxton consented to the entire search. Dkt. 22 at 12. This conversation, however, occurred after two searches already happened.

---

[9]    All three people in the car were placed in handcuffs while the vehicle was being searched. Reed BWC 5:35-6:05. Neither party argues that this temporary detention was a formal arrest, and as such, the Court will not determine this issue.

Moreover, Braxton's statements are inconsistent as to whether he is giving consent ("there's a difference between searching and feeling for something" versus "go ahead"). Thus, summary judgment cannot be granted based on the consent exception because a reasonable jury could conclude that Braxton did not consent to the search.

3.  Terry *Stop*

Waterman also argues the search was "objectively reasonable and entirely permissible" under the Supreme Court's precedent in *Terry v. Ohio*, 392 U.S. 1 (1973); Dkt. 22 at 8. *Terry* stops allow a law enforcement officer who "observe[d] . . . unusual conduct which [led] him reasonably to conclude in light of his experience that criminal activity may be afoot" to "conduct a carefully limited search of the outer clothing of such persons *in an attempt to discover weapons which might be used to assault him*." 392 U.S. at 30 (emphasis added). Once an officer has "reasonable suspicion" that a suspect is either "armed" or "presently dangerous to the officer or to others," he has the right to perform a *Terry* stop and frisk of a suspect. *See United States v. Robinson*, 814 F.3d 201, 206 (4th Cir. 2016); *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998) (officer "must have justification for a frisk or a 'pat-down' beyond the mere justification for [a] traffic stop"). This right "extends to a pat down of a . . . passenger of a vehicle that the police officer has stopped." *Arizona v. Johnson,* 555 U.S. 323, 326 (2009).

During a permissible *Terry* stop and frisk, an officer may lawfully seize "an object whose contour or mass makes its identity immediately apparent" as contraband, even if that object does not feel like a weapon. *Minnesota v. Dickerson*, 626 F.3d 203, 213 (4th Cir. 2010). An officer exceeds the scope of a *Terry* frisk, however, if he is "merely searching for evidence of a crime" or "plac[ing] his hands in their pockets or under the outer surfaces of their garments" without first

10

having reasonable suspicion of a weapon's presence.[10] *Arizona*, 555 U.S. at 327; *Terry*, 392 U.S. at 29-30. An officer may thoroughly examine a suspect during a *Terry* frisk, patting down areas such as socks and groin, provided he aims to "protect himself and others from possible danger." *See Terry*, 392 U.S. at 28; *United States v. Swann*, 149 F.3d 271, 276-77 (4th Cir. 1998) (finding officer's confiscation of hard object found from pat down of sock to be reasonable seizure).

Here, Waterman had sufficient justification to perform a *Terry* frisk of Braxton. Braxton traveled in a vehicle with Page, a "criminal gang member" who had been "on the run for some time," and Scott, who also had a history of drug crimes. Dkt. 22, Ex. A 3:55-4:30, 9:21-9:25. As Waterman searched the vehicle, he found suspected drugs and paraphernalia—all on the backseat within Braxton's immediate control. *Id.* 10:25-19:41. Page claimed the MiraLAX container as his, *see* Reed BWC 15:55-16:03, but no one claimed the suspected drugs (including the capsules) and scale from the backpack were theirs.

Under a totality of the circumstances, and because the officers reasonably believed they had discovered drugs within Braxton's area of control, they had reasonable suspicion that Braxton was "armed" or "presently dangerous to the officers." *Robinson*, 814 F.3d at 206; *United States v. Perrin*, 45 F.3d 869, 873 (4th Cir. 1995) (noting that "it is certainly reasonable for an officer to believe that a person engaged in selling of [narcotics] may be carrying a weapon for protection"); *United States v. Stanfield*, 109 F.3d 976, 984 (4th Cir. 1997) ("As we have often noted, where there are drugs, there are almost always guns."). Waterman did not violate the Fourth Amendment by his choice to perform a *Terry* frisk on Braxton. He had a right to ensure his safety and the safety of the other officers on the scene.

---

[10]     An officer has a right to expand the *Terry* frisk to include pockets and under a garment's outer surfaces ***only if*** he feels what he reasonably believes to be a weapon or contraband.

A reasonable jury, however, could conclude that the scope of Waterman's search exceeded a *Terry* frisk for at least three reasons. First, Braxton had already been frisked by Reed and placed in handcuffs when Waterman began his search. Reed BWC 4:49-4:55. Second, Waterman immediately began emptying the contents of Braxton's pockets at the beginning of the search.[11] Dkt. 22 Ex. A 23:14-25:24. Third, Waterman and the officer assisting him framed the search between Braxton's legs as evidentiary—saying "that is where people hide coke"—rather than as a search for officer safety. *Id.* 25:52-26:07. Relying on all these facts, a reasonable jury could conclude Waterman exceeded the permitted scope of a *Terry* frisk while searching Braxton.

As a reasonable jury could conclude Waterman's search does not fit within an exception to the warrant requirement, the Court cannot grant summary judgment as to this claim. This conclusion, however, does not fully resolve Waterman's summary judgment motion. The Court must still consider whether he is entitled to qualified immunity.

### b. Qualified Immunity

To be shielded from liability because of qualified immunity, Waterman must establish either: (1) that he did not violate the constitution, or (2) that the constitutional right he violated was not "clearly established" "at the time of the alleged violation." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). A right is clearly established if it is outside a legal "gray area." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Marciariello v. Summer*, 973 F.2d 295, 298 (4th Cir. 1992). Put simply, qualified immunity seeks to "prove ample protection" to all but the "plainly incompetent or those who knowingly violate the law." *Lewis v. Carabello*, 98 F.4th 521, 534 (4th Cir. 2024) (citing

---

[11] If Waterman had provided sworn testimony, such as a deposition, that he reasonably believed he had felt a weapon or other contraband, he would have had the authority to fully search Braxton's pockets rather than just pat them down. Without this testimony, however, the Court cannot conclude this is what occurred.

*Malley*, 475 U.S. at 341). Granting summary judgment on qualified immunity is "improper as long as there remains any material factual dispute regarding the actual conduct of the defendants." *Buonocore v. Harris*, 65 F.3d 347, 359-60 (4th Cir. 1995).

> 1. *It is clearly established that* Terry *frisks cannot include reaching into a suspect's pockets unless an officer reasonably believes a weapon is present*

The limited scope of a *Terry* frisk, which must be limited to feeling the outer clothing of a suspect for a secreted weapon, is clearly established in the Fourth Circuit. "Once an officer has patted down a suspect for weapons and determined that he is not armed, the officer exceeds the permissible scope of a *Terry* frisk if he continues to search the subject . . . [a]n officer squeezing, sliding, or otherwise manipulating the contents of a defendant's pocket, if the officer knows the pocket contains no weapon, is prohibited." *United States v. Swann*, 149 F.3d 271, 274-75 (4th Cir. 1998) (citing *Dickerson*, 508 U.S. at 378-79) (internal quotations omitted); *United States v. Goodman*, 14 F.3d 597 (4th Cir. 1993) (an officer "may only intrude into the suspect's pockets or under the outer surface of his garments only if, during the course of the pat down, he feels an object that he reasonable believes could be a weapon that the suspect could use to harm him.").

Here, Waterman began searching Braxton by lifting his sweatshirt and patting down his chest. Dkt. 22, Ex. A 23:12-23. Without patting Braxton's legs down, he immediately removed the contents of his right pocket (including change and a wallet) and emptied the wallet's contents onto the Dodge's roof. *Id.* 23:23-24:35. Waterman next proceeded to empty Braxton's left pocket contents, including his cell phone, after making a comment about how small Braxton's pockets were. *Id.* 24:40-25:04. Finally, Waterman patted down Braxton's waistband, legs, hips, and genital area. *Id.* 25:04-25:30.

As no record evidence exists that Waterman reasonably believed Braxton had a weapon in either of his pockets, a reasonable jury could find that Waterman exceeded *Terry*'s scope by

searching Braxton's pockets. The Court cannot grant Waterman's motion for summary judgment on qualified immunity grounds.

> 2. *It is clearly established that officers cannot use* Terry *frisks to look for evidence of a crime*

The purpose of a *Terry* frisk—to look for weapons and to ensure officer safety—is also clearly established in the Fourth Circuit. "An officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk." *Swann*, 149 F.3d at 274 (citing *Dickerson*, 508 U.S. at 378; *Sibron*, 392 U.S. at 65-66). The authority of an officer to perform a *Terry* frisk is "narrowly drawn" and "permit[s] a reasonable search for weapons for the protection of the police officer, where he has reason to believe he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27; *United States v. Glover*, 662 F.2d 694, 697 (4th Cir. 2011) (*Terry* frisk's purpose is to "neutralize the threat of physical harm" when officer reasonably believes suspect is armed and dangerous); *Adam v. Williams*, 407 U.S. 143, 146 (1972) ("The purposes of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable.").

Here, because of the search's duration and because of the assisting officer's statement that "that is where people hide coke" as Braxton complained about the search of his genital area, a reasonable jury could conclude that Waterman extended his search of Braxton to look for evidence rather than to promote his own safety. Extending a *Terry* frisk to search for evidence of a crime violates the clearly established binding precedent enumerated above. As such, the Court cannot grant summary judgment on qualified immunity grounds.

> 3. *It is not clearly established that an officer cannot incidentally touch a suspect's genitals when performing a* Terry *stop.*

To the extent Braxton wishes to proceed with his arguments that Waterman incidentally touching his genitals over his clothing during the *Terry* frisk violates his clearly established rights, he may not do so as Waterman is protected by qualified immunity. It is not clearly established in binding precedent that, during a *Terry* frisk, an officer may not conduct an outer clothing pat down search of a suspect's genital area (provided the officer is searching for weapons).[12]

### B. Fourteenth Amendment Claim

Waterman argues that Braxton's unreasonable search claim under the Fourteenth Amendment is barred as it is not the "proper vehicle" for such a claim. Dkt. 22 at 9-10. Braxton concedes this point, saying "Defendant currently notes that where a constitutional claim arises from a search or seizure, the Fourth Amendment's objective reasonableness standard, rather than substantive due process, provides the appropriate framework." Dkt. 26 at 7. As Braxton does not argue this point, this cause of action is deemed abandoned, and the Court will grant summary judgment. *See Crosby v. City of Gastonia*, 635 F.3d 634, 638 n.3 (4th Cir. 2011) (allegations neither argued nor briefed at summary judgment are deemed abandoned).

### C. State Law Claims

In support of his motion, Waterman asserts "Braxton's state law claims rely entirely on his arguments supporting his constitutional claims, which fail as a matter of law," therefore, "his state law claims . . . follow suit and fail as well." Dkt. 22 at 10. He does not assert additional arguments about Braxton's state law claims.

---

[12] This limiting principle does not foreclose Braxton from arguing that Waterman extended the search of Braxton's genital area impermissibly, as a shorter search would have been sufficient to eliminate concerns about officer safety, changing the *Terry* frisk into an evidentiary search. In other words, an incidental touching of a suspect's genitals cannot from the basis of a § 1983 claim; however, Braxton may argue to the jury that Waterman extended the search of his genitals beyond what was allowed by *Terry* and that this constitutional intrusion caused him some physical or emotional harm.

As the Court previously discussed, a reasonable jury could find Waterman's search was unreasonable, and further, that he is not entitled to qualified immunity on that claim. Because of this conclusion, and because Waterman offers no additional arguments for the Court to consider, the result is no different for this state law claims, and the Court cannot grant summary judgment.

**CONCLUSION**

For the above-stated reasons, the Court will grant summary judgment as to Braxton's Fourteenth Amendment claim and will deny summary judgment as to all other claims.

A separate order will issue.

The Clerk of Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

Entered this 11th day of May, 2026.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

16